Good morning, and may it please the Court. My name is Mark Thierman, and I represent the Independent Roofing Contractors of California Apprenticeship Training Trust Fund. Today we're about to discuss the exciting and slightly esoteric world of payment of fringe benefits on prevailing wage Davis-Bacon projects. And I would like to point out to the Court, I'm sure the Court may have noticed, that one of the issues in this case involves the term annualization. There is no regulation, there is no statute that defines or clarifies the term annualization. There are a handful of cases, maybe three, that discuss it and give some guidance, none of which I would argue are directly on point. So what is this concept of annualization? In theory, it's a mechanism by which the Department of Labor makes sure that employees who are entitled to receive the prevailing wage in both fringe benefits and in cash contributions or cash payments on their check. The statute uses and the lingo is the word cash, but of course we're talking about payroll checks with taxes taken out. That the total sum paid on prevailing wage work is that which the government mandates to be the prevailing wage. And we're not going to argue whether it is prevailing, except to note that if it really was, we wouldn't have all this litigation about it. That being said, however, there is a theory or a concept that if you have an employee who is paid the prevailing wage, a portion of which is paid into a fringe benefit provider, that that prevailing wage contribution is allowed to be credited towards or deducted from the total package that the contractor is to pay. And to prevent the subsidization of prevailing wage work contributions for non-prevailing wage benefits, i.e., taking a person who, let's say, has a $200 health insurance policy, works half his time on public works jobs and works the other half of his time on private works jobs from claiming the entire credit for the contribution on the public works jobs on an hourly basis, the Department of Labor averages out the contribution over the hours worked. They do this journeyman by journeyman, worker by worker. And one of the questions is, the first question, actually, does prevailing wage annualization, the concept of annualization, even apply in this case? We say it does not, because even though there is no regulation, we still have a statute that all rules must derive rationally from the statute. The Davis-Bacon Act itself has two sections, and I'm going to use the old terminology, 40 U.S.C. 276A, paren B, 2A and B. A is for trusted funds, B is for non-trusted funds, that is, an employer undertaking an enforceable commitment to provide benefits. If you get into the A portion, if you get into the trusted third-party administered, we're going to pay somebody else to do this, then the only question really is how much time or how much more of a ---- I'm sorry. Was there a question? Oh. No, I didn't say something. There might have been some feedback from the speaker. I'm sorry. Go ahead. I wasn't in their direction. I apologize. The ---- anyway, the point is that if it's a trusted third-party administered fund, we do not get into the issue of the reasonable expenses or the reasonable costs of the fund. In the briefs, the DOL likes to make a big deal about how we say, look, we've been audited by the DOL for under ERISA, and all our expenses relate to apprenticeship, and that doesn't count to make it Davis-Bacon compliant. That's true. But it does show that the expenses of the trust fund were reasonable, because that the DOL does do under ERISA. They would take anybody who runs a ---- whether it's a pension fund or a health and welfare fund and spends money lavishly and inexpensively on non-trust-related things and take them to task. The DOL didn't do that. All the money spent of this trust fund are spent on apprenticeship. The other ---- Wasn't some of this money spent on legal fees? Well, isn't that for the benefit of the apprentices? Sure. But a trust fund does not exist on operating costs alone. You've relied on MISTIC, right? What? You've relied on the circuit decision in MISTIC. Yes. Certainly the facts are very different there, because the individual workers there had a fund that they could draw on, and it was clear that they were being benefited. That's true. The situation here is very different, isn't it? Well, the apprenticeship ---- in the apprenticeship law itself, it's very different, because no journeyman, which is what the contributions are made by the journeyman, ever benefits from apprenticeship. There's never a ---- Excuse me. Judge Sedgwick, if you could point that microphone. I'm so sorry, Judge Gould. Is that better? I think that's much better. All right. Sorry. My question had to do with the difference between MISTIC, upon which reliance is placed, and the facts here in this case, and I think we were just getting a response to that. Yes. The response is simple, that apprenticeship is a outlier in the world of fringe benefits, because they do not benefit the journeyman from whom the contributions are allegedly attributable. In other words, the journeyman is, by definition, can't be an apprentice. He's a journeyman. And yet, the bulk of the contributions, almost all the contributions, come from journeymen. So no journeyman ever benefits, in the sense of a health and welfare plan or a pension plan, from apprenticeship contributions. So MISTIC, you can't have a situation where the journeyman says, I want my apprenticeship trust fund contributions back, because after all, I want to get trained or whatever. That doesn't happen, and it can't happen, because by definition, apprentices, once they become journeymen, are not eligible to become apprentices again. So you're having a group of employees subsidizing another group, by definition. And if it's deductible at all, which the statute says it is, then you can't use the MISTIC argument to the extent that the employees can take it back, or at least it's there for them, because it's not, even in the union plans and even in the model plans, that the wages are, the secretary has said, are fine. Because nobody can ever go into an apprenticeship program again. So MISTIC, in that sense, doesn't apply. It is somewhat analogy, this to a defined benefit plan versus a defined contribution plan, or a stated account plan. You can look at an IRA or a defined contribution plan and say, gee, that's Joe's money. You can't look at a defined benefit plan and really say that's Joe's money, because Joe may not vest, or he vests, he may have a pension annuity based on his life expectancy that's unrelated to the contributions that are made on his behalf. So there's an analogy there, but there's certainly nothing controlling. Can you explain the fact that the contributions made on behalf of Royal range from zero per hour to 6.99 per hour? Sure, it was actually, you build a better mousetrap and the mob will beat you down for being different. What they did is they said, look, the fringe benefit level in California, and they have a two tier system, that says X dollars is going to be for fringe benefits no more. You can always pay less and pay the difference in cash, but no more than X in fringe benefits. And the system was, you take whatever X was set by the California prevailing wage, and you subtracted out all the other costs of the fringe benefits, and you put it into, and the remainder went to the trust fund. So it became a residual trust fund. It became a spill over trust or a pour over trust in the sense that anything you didn't spend on something else for the individual benefit of the employee went for the benefit of the group. This may be oversimplifying, but then, for example, employee A might cost 699 for his health plan, and employee B would cost nothing for the health plan, and that explains the difference? Exactly, and the question is, okay, so what's wrong with that? There's no rule that says you have to collect the same amount per employee for apprenticeship contribution. After all, what are we measuring? We're measuring the apprenticeship contribution's benefit to that employee? There is none. There's never a benefit to that employee, because the apprentice... Assuming you're working on Davis-Bacon projects for, say, four months of the year, and on non-such projects for eight months of the year, is the same amount taken out from the Davis-Bacon and the non, or is it a different amount? Or is the Davis-Bacon basically financing the whole year's worth of benefits for the apprentices? No, there's a minimum contribution that is made that says, this is the transient cost, so these are the minimum you have to make, and that's- 20 cents an hour. Yes, that's the 20 cents an hour. So what you're doing is you're saying to Davis-Bacon people, look, we spent a fortune suing the state of California getting approved and becoming an apprentice program as opposed to a training program, which requires no approval. We're capitalizing our costs over the people who are enjoying the benefit, i.e., the people who use it on public works. That is the rationalization or the rational for doing that. When you're not doing Davis-Bacon projects, then the company only contributes up to 20 cents? Is that what it- That's the plan. 20 cents, is that right? That's the plan. But on Davis-Bacon projects, it contributes more, is that correct? So you attribute the spillover amount. And all of this additional amount is part of what's needed to fund the apprenticeship benefits coming back to your employees, is that right? And part of, and other employers, because it's a pool. And that's the other point. There's no correlation between, and the DOL admits in other opinion letters, including Mary, there's no correlation between the number of apprentices you have and your apprenticeship contribution. You can have none, and most employers have none, no apprentices, and they make better contributions anyway. So if you're on a Davis-Bacon job and you have no apprentices, you would still be putting in up to $6.99 per hour into the plan? Right. Even though you could do only 20 cents per hour, is that correct? No, you can't, because the plan mandates that you do the higher amount. For, if you're on a Davis-Bacon project? For state prevailing wage, yes. So the state, so the plan says to the participants, or to the employers, that in order to pay for the costs that we have, we're going to tax you, and here's the way, it's a graduated tax. It's basically your share after you pay for the expenses of other fringe benefits. Well, let me see if I understand you. If you paid, if you opted for method A as opposed to method B, wouldn't you be free to pay in our hypothetical 20 cents into the apprenticeship program and the other $6.79 to the employee? Yeah, and you would be, you don't get to choose method A if you have apprentices, and certainly not in the number of apprentices that this employer had. But yes, you theoretically could pay 20 cents an hour, and that would just cover the operational costs of basically maintaining the plan with nothing else. But the plan isn't set up for A and B like that. The plan is set up for on public works, you will contribute this default amount. That's really the way it is. It's not A or B straight across the board. It's A for private work, B for public work, because in order to pay back the cost of having established the plan and getting it approved and all that other stuff. So the plan's designed to make public works pay a higher amount to it than other works, is that correct? The plan is designed to, yes, to recoup the costs of its formation as an apprenticeship program, not as a training program. The costs of training program are negligible. But the cost of getting state approval for apprenticeship was tremendous. I mean, there are Supreme Court cases involved, and there are Ninth Circuit cases involved. There was the ERISA preemption issue. It went up, all these cases went on and on and on. Now, somewhat overruled by the Supreme Court's Dillingham decision. But the cost of becoming an official apprenticeship program, which is only of value on public works jobs, was being charged to the public works contractor. As opposed to the cost of training, which is separate and apart, or that they could do without all that extra cost. You're down to about a minute and 24 seconds if you want to take any time. No, let me- Rebuttal. Let me just plow ahead then. I'm sorry that, yeah. Two things. You asked a question about the annualization issue. If you go ahead and do what your honors have suggested in the analogy, then the DOL's method of annualization is incorrect also. They should go journeyman by journeyman. They should weigh how many hours they spent on public works and private works. If you had two people, one worked only public works and one worked only private works, you wouldn't annualize either one of them. But the DOL did, in fact, do an aggregate, and that was an improper method. On page 14 of the record, on the very back, they said that the DALJ didn't have a reasonable basis for allocation and contribution, so they fell back on what the DOL field agent said. Well, there was no support for that. There's just what else, what we're going to do, we're going to go with the DOL field agent. That's not a supportable record. And I guess my last point before my 18 seconds is over is, you know, we did – there was a big confusion as to what was necessary or what was required to show that these people were indentured when the State kept losing their indenture certificates. In the brief and at trial, we said they were indentured. And in the brief, that evidence was admissible. So to say that they're not indentured really is clear factual error. Thank you. Roberts. May it please the Court. My name is Mary Reser. I represent the Secretary of Labor. I would like to cede two minutes of my time to counsel for the intervener, local 81 roofers, and her name is Roberta Perkins. Well, watch your time. When you're down to two minutes, you're going to have to stop. Thank you. Because it will keep ticking. If you keep talking, it will keep ticking. Thank you. There are only two issues before this Court, annualization and the registration of apprentices. Royal Roofing underpaid its workers on Davis-Bacon work. They were entitled to receive the prevailing wage. Instead, Royal Roofing took excessive credits against their wages by making excessive contributions to the apprenticeship plan and then taking varying amounts, up to $6.99 an hour, subtracting that from the money that it owed to these workers on the Davis-Bacon work. Royal Roofing did not contribute at all when it was working on private projects. It only contributed when it was working on Davis-Bacon projects. It contributed more than the minimum amount it was required to contribute. And when the investigator calculated the wages, the reason that the ALJ accepted the investigator's calculations after finding that the contributions were not reasonably related to the benefits received, the ALJ accepted the calculations because the investigator didn't have access to the cost of the training. So she actually took Royal Roofing's figures, used their total contributions for the year 1996, and divided those contributions by the total number of hours worked by the employees on both Davis-Bacon and non-Davis-Bacon work to come up with a creditable amount that this employer could claim toward its prevailing wage obligations on Davis-Bacon work. And that was $0.50 an hour, which was very generous to Royal Roofing. And it was even more than the $0.20 an hour that it required employers to contribute under Method A. They suggest that under the terms of that trust, when they're working on Davis-Bacon, they must contribute more than the $0.20 an hour because they're trying to amortize the cost of the apprenticeship program, which only really applies to Davis-Bacon kinds of jobs, against they're trying to amortize what it costs them to set that up. They say the trust requires it. Is there any response to that? That's an inaccurate statement on their part because, in fact, this apprenticeship training program was a continuous program providing training throughout the year. It required 4,000 hours of on-the-job training and 144 hours of classroom instruction as well. And this was continuous throughout the year and required about three-and-a-half years for an apprentice to work his way up to journeyman status. I think we understand that, but their point is different. They're saying it doesn't matter that that's what it costs. It doesn't matter if it takes them that long to work their way up to journeyman status. The time doesn't matter. The fact is the trust says we have to contribute more when you're on a Davis-Bacon job. And I'm just asking, assuming for the moment the trust requires that, does that make any difference? No, it does not make any difference because we are not looking at the trust. We are just looking at what this employer was required to pay for Davis-Bacon work. He was required to pay the prevailing wage. And what annualization does is it's just a method to use to apportion his contributions throughout the year because the benefits continue throughout the year, just as in the Myre decision, where there was an apprenticeship plan very similar to this. The court there, the 11th Circuit, said that annualization was a good way to go to figure out what the hourly base rate creditable to Davis-Bacon work would be for employees, for prevailing wage employees. This is where, just like this in this case, the employer decided to contribute to a year-round plan. It was an apprenticeship training plan benefiting the employees all year long, but just making contributions under the Davis-Bacon for Davis-Bacon work. Would the reasonable amount of contribution be the 20 cents per hour? Would that be reasonable? That would be reasonable. Because the plan said it? What if the plan said a thousand dollars an hour? No, that would not be reasonable. In this case, that method A was apparently the same 20 cents an hour which union contractors were requiring at that time. This is what the prevailing wage rate was at that time, back in 1996. Under that method, they required 20 cents an hour year-round for both private and Davis-Bacon work. But this employer contributed under method B, which was a different method. Those methods were established in the plan. By the plan, and we're not looking at the plan. But the 20 cents simply reflects what was paid by union contractors on all their work.  That's right. And so I think I understand your position to be it doesn't matter what is said in the plan if they're levying, if you will, a higher charge against the workers on the Davis-Bacon projects in order to subsidize those who are working on private jobs. We're saying that you can't do that. You cannot use the contributions that you make for these employees to subsidize private work. So you're agreeing with me. I mean, your concern is not what's written in the plan, but the fact the way it operates, you've got Davis-Bacon work subsidizing private work. The contributions. Yes. We're talking about what this contractor did do, making excessive contributions and then improperly crediting them against its Davis-Bacon obligations. That's the only question here. Let me ask you this, and it may be getting too far afield. But suppose hypothetically that this plan had recognized that they had certain overhead costs that might be greater than what the union contractors were paying to the apprenticeship programs and said method A will be $0.28 an hour, not $0.20, but $0.28. Could something like that have been done, and would it necessarily evoke concern from DOL? Well, in this case, the prevailing wage statute does not regulate plans. It doesn't regulate the apprenticeship plan. It only regulates the amount of money a contractor pays to its employees on federal contracts. And in this case, the Secretary of Labor determines what the wage is that is prevailing in the locality. That includes fringe benefits. And that includes bona fide fringe benefits, such as contributions to defray the cost of apprenticeship. We don't look at the plan under this law, and that's what we're here about today. Well, then were you getting a $0.20? We're just using that as a – the reason I brought – You're getting it out of the plan, are you not? No, that's what the plan said. What I'm saying is that using the investigator's calculations, she came up with a $0.50 an hour credit. No, no, wait a minute. That's not my question. The $0.20 an hour is coming from where? That $0.20 an hour is coming from the plan. That really – it doesn't come into play here. And if the plan said $0.30 an hour, you wouldn't care about that either, right? Correct. You don't care what the plan says. That's right. All right. And you come up with the $0.50 an hour comes from somewhere else. I'm not concerned about the details. So are you saying that if an employer is in an apprenticeship plan that requires $0.50 an hour, make it $0.75 an hour, and you think that's too high a number to pay to an apprenticeship plan, then you just don't let the employer take it under the Davis-Bacon, is that right? It depends. If the employer is making contributions only for Davis-Bacon work, the answer would be one thing, because it would be funding the benefits for those employees on that work only. I understand. Suppose he's paying $0.75 an hour all the time. We would look to see if that is reasonably related to the benefits received by the employees. Now, here we say that it doesn't really matter because a reasonable relationship is not an issue here, since this employer had the annualization computations made. It didn't have anything to do with reasonable relationship because we didn't have the figures. So the computations that were actually made, the back-wage liability, was calculated based on his actual contributions to the plan, divided by the actual number of hours that all the employees worked on private and public work. And this is the creditable amount he can claim for the Davis-Bacon part of the work. Okay. But you're saying that to take it a step backward, if indeed he was contributing that all the time, the $0.75 an hour over time, and you have the ability to audit what training is going to the apprentices from the plan, I take it, and say, well, the value of that is only $0.15 an hour, and therefore we're not going to give you more than $0.15 on Davis-Bacon. Is that right? That's right. So in other words, you do regulate in that sense. We don't regulate the plan. You don't regulate the plan, but you do check on what the plan is giving as services for what it's taking in as income in the front end, right? That's right. That's what the court in Myrie did. And we think that it should be reasonably related to the benefits received. But that doesn't come into play here. And I just want to make one statement with regard to the registration of the apprentices. The burden of proof was on Royal Roofing to show that they met the regulatory requirement that apprentices be individually registered in a bona fide apprenticeship program recognized by the Department of Labor or by a state apprenticeship agency. The investigator checked with the agency, the state, and was told that 12 of these employees were not registered. The ALJ found that the testimony of the plan administrator was not convincing and that they did not prove that, in fact, these apprentices were registered with the state as they should have been. Therefore, they should have been paid the journeyman rate. I see that my time is almost up. I would like to ask that this Court affirm the decision of the Administrative Review Board under the APA Standard of Review because it was not arbitrary or capricious or an abuse of discretion. Thank you. Thank you. May it please the Court, Roberta Perkins, Weinberg, Roger Rosenfeld, on behalf of Intervenor Roofers Local 81. As Mr. Thierman appropriately noted, we're dealing here today with a very esoteric issue, but that should not diminish at all the importance of the decision that we're asking this Court to make because employers who cheat to compete have found various and creative ways to do that, and by using excessive contributions, getting credit towards Davis-Bacon or, indeed, California Public Works projects, they have found a way to diminish the wages that should be paid by law to the worker. We join with the Department of Labor and ask that this Court adopt the Myree standard to give a clear, bright-line test for employers making contributions that those contributions must be reasonably related to the benefits provided to the workers, and to adopt the annualization methodology that has been used by DIR for a year — excuse me, the Department of Labor for years to calculate those — the contributions. This will protect worker wages. It closes the loophole for excessive contributions, for cheating, and will provide benefit to the public in terms of competitive and fair bidding and protecting the workers. Of course, the plan can charge overhead, right? Pardon me? The plan can pay for its own overhead, right? Not using contributions made by employers for training apprentices. Well, that's a very interesting concept. Thank you. Thank you. This matter will stand submitted. We thank everyone for their argument. We appreciated it. Thank you. Thank you. Thank you.
judges: Fernandez, Gould, Sedwick